## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | | |
|---|---|---|
| Erik Dehlinger, | ) | C.A. No. 4:11-70007-TLW |
| | ) | Crim. No. 4:06-900 |
| Petitioner, | ) | |
| | ) | |
| -versus- | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

<u>PROCEDURAL HISTORY</u>

This matter comes before the Court on the Petitioner Erik Dehlinger's (hereinafter "Dehlinger" or "Petitioner" or "Defendant") filing of a motion pursuant to 28 U.S.C. § 2255, seeking to vacate, set aside, or correct the sentence he received after being convicted, after a trial by jury, of three counts of willfully making and subscribing to a false tax return in violation of 26 U.S.C. § 7206(1). As the record reflects, on August 22, 2006, a federal Grand Jury returned an Indictment which charged the Defendant with one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371 and three counts of willfully making and subscribing to a false tax return in violation of 26 U.S.C. § 7206(1). On October 15, 2007, a jury returned a verdict of guilty as to the three counts of willfully making and subscribing to a false tax return. Defendant was acquitted on the Conspiracy count. On October 22, 2007, Defendant filed a "Motion for Judgment of Acquittal," which was denied by Order of the Court filed January 4, 2008. On April 3, 2008, Defendant filed a Motion for a New Trial based upon newly discovered evidence. After briefing by the parties, the Court denied this motion by Order filed November 24, 2008. Defendant was sentenced on January

1

7, 2009, to a total aggregate sentence of forty-two (42) months imprisonment (36 months each as to Counts 2 and 3, with such terms to run concurrently, and 6 months as to Count 4, to run consecutive to the previously imposed sentence). His term of imprisonment was to be followed by a one year period of supervised release (one year as to each count, all such terms to run concurrently). Petitioner filed an appeal with the Fourth Circuit Court of Appeals. On March 5, 2010, the Fourth Circuit issued an opinion affirming Defendant's conviction and sentence. Petitioner then filed the present action on January 13, 2011, alleging a single ground for relief. (Docs. # 192 & # 194). The Government filed its response to Petitioner's motion for relief under 28 U.S.C. 2255 on March 1, 2011. (Doc. # 198). An evidentiary hearing was held in this matter on December 19-20, 2011. This matter is now ripe for decision.

## 28 U.S.C. 2255

Section 2255 provides that a prisoner in custody under sentence of a federal court may file a motion in the court which imposed the sentence to vacate, set aside, or correct the sentence. The statute states four grounds upon which such relief may be claimed: (1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose such sentence; (3) that the sentence was in excess of the maximum authorized by law, and (4) that the sentence is otherwise subject to collateral attack. 28 U.S.C.A. § 2255. Generally, 28 U.S.C. § 2255 requires Petitioner to prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law." Leano v. United States, 334 F.Supp.2d 885, 890 (D.S.C. 2004). This is the proof needed to allege a constitutional error. "The scope of review of non-constitutional error is more

limited than that of constitutional error; a non-constitutional error does not provide a basis for collateral attack unless it involves 'a fundamental defect which inherently results in a complete miscarriage of justice,' or is 'inconsistent with the rudimentary demands of fair procedure.'" Leano, 334 F.Supp.2d at 890 (quoting United States v. Mikalajunas, 186 F.3d 490, 495-96 (4th Cir. 1999)). In deciding a section 2255 motion, the court must hold an evidentiary hearing unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. As previously indicated, the Court held an evidentiary hearing in this case.

BACKGROUND[1]

A.      Anderson's Ark and Associates

Before analyzing the issues in this § 2255 petition, the Court believes it beneficial to provide some historic background on the Anderson's Ark and Associates Entity and some of the individuals involved with its structure and operation. The Government prosecuted the Defendant for his participation in an allegedly fraudulent tax scheme devised by Anderson's Ark and Associates (hereinafter "AAA"). The Defendant participated in both of AAA's two allegedly fraudulent tax schemes: the Look Back program and the Look Forward program. According to the Government, the Look Back program involved the creation of phony loans that formed the basis for fraudulent partnership losses that were claimed as tax deductions on the AAA member's individual tax return. The Look Forward program was an asserted scheme that involved deducting personal expenditures

---

[1]The portions of the background which relate to cases outside of this District have been taken in large part from the Government's memorandum. These facts do not appear to be in dispute. Additionally, as they are provided for background information only, the Court does not find them essential to the legal analysis related to the issue of relief.

such as car and student loan payments as business expenses and then concealing funds in offshore accounts.

In Seattle, Washington, which is within the Western District of Washington, the Government prosecuted numerous AAA promoters for conspiracy to defraud the Internal Revenue Service (IRS) in violation of 18 U.S.C. § 371 and other violations. United States v. Anderson et al, No. 2:02-cr-00423-JCC. The grand jury returned the first indictment in December of 2002 and a second superseding indictment in August of 2004. The defendants were Keith Anderson, Wayne Anderson, Richard Marks ("Marks"), Karolyn Grosnickle, Richard Grosnickle, James Moran, Pamela Moran, Tara LaGrand ("LaGrand"), Gary Kuzel ("Kuzel"), and Lynden Bridges ("Bridges"). Of these defendants, Marks, LaGrand, Kuzel, and Bridges were so-called AAA "planners." AAA planners prepared the tax returns underlying the fraudulent Look Back and Look Forward schemes.

Engelhard, the Defendant's lead trial counsel in October of 2007, represented LaGrand in the Seattle case. Engelhard had been involved with the AAA investigation since January of 2002, when he was approached by the Defendant's present counsel, Michael Minns, to represent AAA planners LaGrand and Kuzel, as well as another planner who was not prosecuted, Collis Redd ("Redd"). Engelhard apparently agreed initially to represent all three individuals. Subsequently, Engelhard asserts that he told Kuzel and Redd that he would not represent them and that he intended to represent only LaGrand. The Government indicates that Engelhard took this position based in part on conversations with one of the Government prosecutors. Engelhard asserts that he never had any substantive discussions with Redd. In fact, according to the record, Engelhard never met Redd in person, and his communications with Redd before 2008 consisted of three or four short telephone conversations. Declaration of Scott J. Engelhard dated August 11, 2008 ("Engelhard Aff., 8/11/08"),

¶¶ 4-8, Petitioner's Ex. # 5; Evidentiary Hearing Testimony of Collis Redd, December 19, 2011, Tr. p. 209.

Engelhard made his first court appearance on behalf of LaGrand in January of 2003. Engelhard did not appear on behalf of any other defendants or witnesses in the Seattle case, including Kuzel, who was represented by attorney Joseph E. Rowland. In November of 2003, Engelhard became court-appointed counsel for LaGrand (he was initially retained counsel).

LaGrand had been charged in the August 2004 indictment with one count of conspiracy to defraud the IRS in violation of Section 371 and fifteen counts of willfully aiding and assisting in the filing of false tax returns in violation of 26 U.S.C. § 7206(2). The tax loss was well over $20 million. Accordingly, on the charges in the indictment, she faced a very substantial sentence of imprisonment if convicted.

Two AAA planners pled guilty before indictment: Roosevelt Drummer ("Drummer") and Roy Lentz ("Lentz"). Lentz testified on behalf of the Government at trial, but Drummer did not testify for the prosecution or the defense. The Government ultimately did not prosecute certain AAA planners, including Redd and George Benoit ("Benoit"). The Government indicates that Benoit prepared a number of the Defendant's fraudulent tax returns.

Before trial, Engelhard asserts that he recalls sending a conflict waiver form to Redd, based on his previous decision to represent only LaGrand, but he did not receive a response from Redd. Redd does not recall whether he ever signed a waiver. Engelhard Aff., 8/11/08, ¶ 10, Petitioner's Ex. # 5; Affidavit of Collis Redd dated February 22, 2008 ("Redd Aff., 2/22/08"), ¶ 6 (unnumbered), Petitioner's Ex. # 10.

Trial of the AAA promoters took place in November and December of 2004. In late December of 2004, after approximately six weeks of trial and approximately two weeks of jury deliberations, the Seattle jury convicted Keith Anderson, Wayne Anderson, and Marks for conspiracy to defraud the IRS and other tax fraud violations. The jury deadlocked against planners LaGrand, Kuzel, and Bridges, resulting in mistrials.[2]  The record in this case suggests that at the Seattle trial, on both direct and cross examination, LaGrand testified that she did not know that any aspect of the AAA program was illegal and that she did not knowingly or intentionally do anything illegal as an accountant for any of her AAA clients.  <u>See</u> Motion to Quash Subpoena for Trial Testimony of Tara LaGrand, which includes the Declaration of Scott Engelhard dated December 2, 2007, ¶ 2, Petitioner's Ex. 4.  In May of 2005, LaGrand, Kuzel, and Bridges each pled guilty to one count of Section 7206(2).  Contrary to her trial testimony, LaGrand's plea agreement includes a statement of facts containing the following:

> D.    As the Defendant [LaGrand] knew full well at the time, the above described transaction [look back loans] was not at arms length.  Neither La Maquina Blanca nor Mason Advertising were actual companies, but merely bank accounts owned and operated by AAA.  Accordingly, the tax deduction the defendant placed on her AAA clients' tax returns was false.

> E.    On or about April 15, 2011 the defendant prepared for filing a 2000 federal income tax return for a AAA client reporting a Look Back tax deduction of $500,000 which she well knew and believed to be false.

> See Motion to Quash Subpoena for Trial Testimony of Tara LaGrand, which includes the Declaration of Scott Engelhard dated December 2, 2007, ¶¶ 4-5, Petitioner's Ex. # 4.

---

[2]The jury also deadlocked against Richard Grosnickle, who subsequently pled guilty to one count of obstructing and impeding the IRS in violation of 26 U.S.C. § 7212. The jury convicted James and Pamela Moran of tax fraud, but the Ninth Circuit Court of Appeals overturned the convictions of James and Pamela Moran in mid 2007.  In December 2007, following a retrial, the jury acquitted them.

In September and October of 2005, LaGrand, Kuzel, and Bridges received sentences of 24 months (LaGrand), 24 months (Kuzel), and 18 months (Bridges), respectively. LaGrand was released from prison in July 2007. Under the terms of her sentence, she remained on supervised release for an additional year.

B.    Criminal Investigation and Indictment of the Defendant

The Government indicates that it has prosecuted numerous purchasers of AAA's tax fraud schemes. The IRS initiated a criminal tax investigation of the Defendant in 2002. In June of that year, special agents from the IRS executed a search warrant at the Defendant's residence. United States v. Dehlinger, No. 4:02-cr-482 (filed June 26, 2002). Subsequently during the investigation, in October of 2003, the Defendant submitted to an interview with IRS agent Thomas Oenbrink. Trial Transcript, Vol II, p. 97. During the interview and afterward, the Defendant was represented by J. Preston Strom, former U.S. Attorney for the District of South Carolina.

Prior to indictment, in approximately July of 2006, the Defendant retained Robert J. Stientjes as co-counsel. Draft (unsigned) Affidavit of Robert J. Stientjes dated March 2008 ("Draft Stientjes Aff., 3/08"), ¶ 2, Government Ex. # 2. Before indictment, Attorneys Stientjes and Strom engaged in plea discussions with the Government. The Government indicates that it offered an agreement in which the Defendant would plead guilty to one felony count and would cooperate with the Government against other potential defendants who purchased the tax fraud schemes sold by AAA. The Defendant rejected the offer.

In August 2006, the Defendant was indicted for one count of conspiracy to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371 and three counts of willfully subscribing materially false tax returns in violation of 26 U.S.C. § 7206(1). Attorney Strom's representation of Defendant

ceased soon after arraignment in Florence, South Carolina. Attorney Stientjes continued to represent the Defendant, with Attorney John M. Ervin, III, joining the defense team as local counsel.

C.    Retention of Engelhard

Subsequently, the Defendant hired Engelhard as trial counsel. Engelhard was recommended by Stientjes' then law partner Anthony Gasaway. To undertake such representation, Engelhard retained "of Counsel" by Stientjes's former law firm, Gasaway & Stientjes, L.L.C. Draft Stientjes Aff., 3/08, ¶¶ 7,10, Government Ex. # 2; Affidavit of Robert J. Stientjes dated October 11, 2010 ("Stientjes Aff., 10/11/10"), p. 2, Petitioner's Ex. # 7.

As stated, Engelhard had been LaGrand's court-appointed trial counsel in Seattle and had won a mistrial for her, which was significant in the Defendant's decision to hire Engelhard. The Government indicates that LaGrand was also represented at trial in Seattle by Anthony Gasaway.[3] As Stientjes stated in his affidavit:

> My partner, Tony Gasaway, had recommended Engelhard as an experienced criminal defense attorney who had won a mistrial for Tara LaGrand in Seattle, Washington, in 2004.
>
> Stientjes Aff., 10/11/10, p. 2, Petitioner's Ex. # 7.

---

[3] At the evidentiary hearing in this case, Engelhard was asked:

Q.    And had you, in fact, represented -- well, what was your professional association with Mr. Gasaway in terms of the AAA cases?

He responded:

A:    Tony Gasaway was at some point retained by Tara LaGrand for some period of time to assist her but not be a trial counsel. But then later he -- the parties, or the defendants agreed that they felt that they really needed someone with his level of tax law expertise. Made an application to Judge Coughenour for him to be what I think we called special tax counsel, and he basically served as a specialist but for all the defendants. And he was allowed to come and go during this pretty lengthy trial. Did some examinations of the case agent and experts on behalf of all the defendants.

Evidentiary Hearing Testimony of Scott J. Engelhard, December 19, 2011, Tr. p. 105.

Engelhard stated the following in paragraph 13 of his August 11, 2008 declaration:

> Dr. Dehlinger and Mr. Stientjes were well aware of my previous representation of Tara LaGrand. In fact, Mr. Dehlinger sought my services largely because of my work for Ms. LaGrand.

Engelhard Aff., 8/11/08, ¶ 13, Petitioner's Ex. # 5.

## DISCUSSION

Petitioner has filed this action making a single claim in his petition alleging ineffective assistance of counsel under the Sixth Amendment based on a purported conflict of interest by his trial counsel, Scott J. Engelhard, during Engelhard's representation of him. The substance of the Defendant's motion is that Engelhard had a conflict of interest when representing the Defendant; that the conflict of interest denied the Defendant the benefit of three potential trial witnesses; and that, as a result, the Defendant's Sixth Amendment right to effective counsel was infringed warranting a new trial.

A.    The Legal Standards

A claim of ineffective assistance of counsel is subject to collateral review pursuant to § 2255. McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970). Generally, in order to prevail on a claim of ineffective assistance of counsel, the defendant must prove two things: one, that counsel's performance fell below an objective standard of reasonableness; and two, that counsel's deficiencies prejudiced defendant's defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). The defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

"A criminal defendant's Sixth Amendment right to effective assistance of counsel includes a right to counsel unhindered by conflicts of interest." Mickens v. Taylor, 240 F.3d 348, 355 (4th Cir. 2001)(en banc), aff'd, 535 U.S. 162 (2002); see also United States v. Tatum, 943 F.2d 370, 375 (4th

Cir. 1991) (noting that the Sixth Amendment is implicated when the representation of counsel is adversely affected by an actual conflict of interest). When counsel is burdened by an actual conflict of interest, he "breaches the duty of loyalty, perhaps the most basic of counsel's duties." Strickland, 466 U.S. at 692. Due to the inherent seriousness of the breach and the difficulty in "measur[ing] the precise effect on the defense of representation corrupted by conflicting interests," the standard for determining whether a defendant is entitled to relief for ineffective assistance of counsel is modified such that defendant need not show prejudice. Id. Rather, "[p]rejudice is presumed ... if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" Id. (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)). In Strickland v. Washington, the Supreme Court thus recognized that a claim of ineffective assistance of counsel arising from counsel's conflict of interest presents a special case subject to the standard articulated by Cuyler v. Sullivan, 446 U.S. 335 (1980). Strickland, 466 U.S. at 692; see also Mickens v. Taylor, 240 F.3d at 355. (citations omitted). The Supreme Court in Cuyler v. Sullivan articulated the relevant standard to establish ineffective assistance of counsel on conflict of interest grounds as requiring that a petitioner establish that (1) his attorney labored under "an actual conflict of interest" that (2) "adversely affected his lawyer's performance." Cuyler, at 348. Again, after a petitioner satisfies this two-part test, prejudice is presumed. Strickland, 466 U.S. at 692.

In Mickens v.Taylor, the Supreme Court clarified the Cuyler v. Sullivan standard. 535 U.S. 162, 171-172, n.5 (2002). In Mickens, the Supreme Court noted that "'an actual conflict of interest' meant precisely a conflict that affected counsel's performance—as opposed to a mere theoretical

division of loyalties."[4] Id. The Supreme Court concluded that the phrase "actual conflict of interest"

was shorthand for the statement in Cuyler v. Sullivan that "a defendant who shows that a conflict of

interest actually affected the adequacy of his representation need not demonstrate prejudice in order

to obtain relief." Id. In other words, an actual conflict for Sixth Amendment purposes is precisely

one that adversely affects the attorney's performance. Id. This clarification was noted by the Fourth

Circuit Court of Appeals in United States v. Nicholson, 611 F.3d 191 (4th Cir. 2012) ("Nicholson II")

wherein the Court explained as follows:

> In Nicholson I, we described Sullivan as requiring the petitioner to show "(1) that his
> lawyer was under 'an actual conflict of interest' and (2) that this conflict 'adversely
> affected his lawyer's performance.' " Nicholson I, 475 F.3d at 249 (quoting Sullivan,
> 446 U.S. at 348, 100 S.Ct. 1708). In so doing, we followed a longstanding practice
> of our Court. See, e.g., Mickens v. Taylor, 240 F.3d 348, 355 (4th Cir. 2001) (en
> banc) (delineating same two-part test), aff'd, 535 U.S. 162, 122 S.Ct. 1237, 152
> L.Ed.2d 291 (2002). In the Supreme Court's Mickens decision, however, the Court
> clarified that "the Sullivan standard is not properly read as requiring inquiry into
> actual conflict as something separate and apart from adverse effect. An 'actual
> conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely
> affects counsel's performance." 535 U.S. at 172 n. 5, 122 S.Ct. 1237. Thus, we now
> describe and apply Sullivan as requiring the petitioner to show, in order to prevail on
> an actual conflict of interest claim, that (1) petitioner's lawyer operated under a
> "conflict of interest" and (2) such conflict "adversely affected his lawyer's
> performance." Sullivan, 446 U.S. at 348, 100 S.Ct. 1708.

> Nicholson II, 611 F.3d at 196, n. 2.

Accordingly, to prevail on his conflict of interest claim under the clarified standard, the petitioner

must show that (1) his lawyer operated under a conflict of interest; and (2) that said conflict

"adversely affected his lawyer's performance." Id.

---

[4]The Fourth Circuit noted in its Mickens decision that the two requirements, "an actual
conflict of interest resulting in an adverse effect on counsel's performance, are often intertwined,
making the factual analyses of them overlap." Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir.
2001).

In <u>Cuyler v. Sullivan</u>, the Court noted that a defendant must show that his attorney "actively represented conflicting interests" to establish the constitutional predicate for his claim of ineffective assistance of counsel.[5] <u>Cuyler</u>, 446 U.S. at 350; <u>see also United States v. Tatum</u>, 943 F.2d 370 (4th Cir. 1991) (noting that an attorney has an actual conflict when he actively represents conflicting interests). In evaluating whether a conflict of interest was present, the Court in <u>Nicholson II</u>, noted that the conflict of interest inquiry in its earlier decision in <u>Nicholson I</u> focused on whether counsel's two clients particularized "interests diverged with respect to a material factual or legal issue or to a

---

[5] In <u>Cuyler v. Sullivan</u>, Chief Justice Marshall concurred in part and dissented in part. In footnote 3 of his opinion he noted that:

"Conflict of interests" is a term that is often used and seldom defined. The American Bar Association's usage, which has remained essentially unchanged since the promulgation of the Canons of Professional Ethics in 1908, is a fair statement of what is ordinarily meant by the term, and it is that meaning that I adopt here. The ABA Standards state that a lawyer should not undertake multiple representation "if the duty to one of the defendants may conflict with the duty to another." ABA Project on Standards for Criminal Justice, Defense Function, Standard 4-3.5(b) (App.Draft, 2d ed. 1979). The Code of Professional Responsibility forbids multiple representation "if it would be likely to involve [the lawyer] in representing differing interests," unless the lawyer can adequately represent each client and obtains the informed consent of each. ABA Code of Professional Responsibility, Disciplinary Rule 5-105(A)-(B) (1976). The Code of Professional Responsibility superseded the Canons of Professional Ethics (1937), which spoke of "conflicting interests" rather than "differing interests." The term was defined in Canon 6: "[A] lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." The ABA materials do not, of course, define the constitutional standard. However, they are consistent with Glasser's emphasis on the interests of the defendants, and the corresponding duties owed by the attorney, rather than on the empirical question of the effect of the conflict on the attorney's performance. See Comment, Conflict of Interests in Multiple Representation of Criminal Co-Defendants, 68 J.Crim.L. & C. 226 (1977). There is a possibility of conflict, then, if the interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties. There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action.

course of action." Nicholson II, 611 F.3d at 215 (citing United States v. Nicholson, 475 F.3d 241 (4th Cir. 2007) ("Nicholson I")).

In addition to showing the presence of a conflict of interest, a defendant must demonstrate that the conflict adversely affected counsel's performance. To establish adverse effect, a defendant must show (i) the existence of a plausible, alternative defense strategy or tactic that his defense counsel might have pursued; (ii) the objective reasonableness of that alternative strategy under the circumstances of the case, meaning that such strategy was "clearly suggested by the circumstances;" and (iii) linkage between the failure of defense counsel to pursue that strategy or tactic and the conflict of interest. Nicholson II, 611 F.3d at 191, 197 (4th Cir. 2010) (citing Mickens v. Taylor, 240 F.3d 348 (4th Cir. 2001) (adopting for the Fourth Circuit the three-part adverse effect standard utilized by the Eleventh Circuit in Freund v. Butterworth, 165 F.3d 839, 860 (11th Cir.1999) (en banc))). With respect to the third prong, that counsel's failure to pursue the objectively reasonable defense strategy was linked to the conflict, the Fourth Circuit in Nicholson II, noted as follows:

> [T]he Freund court explained that the petitioner is entitled to prove such a link in either of two ways: (1) by "establish[ing] that the alternative defense was inherently in conflict with ... the attorney's other loyalties or interests" (the "first aspect of the Freund test"), or (2) by otherwise showing that the alternative defense was "not undertaken due to" those other loyalties or interests (the "second aspect of the Freund test"). The Freund court's test on the link issue is a longstanding and widely utilized standard for determining whether a conflict of interest adversely affected a lawyer's performance.

> Nicholson II, 611 F.3d at 212 (citations omitted).

The Court in Nicholson II also noted that "[a]lthough, prior to today, we had not explicitly adopted the Freund court's test on the link issue under the third Mickens prong, its application is entirely consistent with relevant Supreme Court and Fourth Circuit precedent." Id. at 213-214.

In support of his claim, Petitioner asserts that his only defense on the three grounds of tax evasion was his good faith reliance on tax planning experts called "planners," two of whom prepared the tax returns he was convicted of falsely filing and signing. These planners were connected with and/or employed by Anderson's Ark & Associates. Petitioner's claim arises out of his assertion that his lead trial counsel, Engelhard, was also counsel, at some point and for some duration, for three of the AAA planners: Tara LaGrand ("LaGrand"), Collis Redd ("Redd"), and Gary Kuzel ("Kuzel").[6]

With regards to Redd and Kuzel, Petitioner asserts that Engelhard failed to disclose to him that he was paid by AAA to represent these planners, as well as LaGrand. Further, with regards to LaGrand, Petitioner asserts that Engelhard's representation of LaGrand was often overlapping with his representation of Petitioner. Petitioner asserts it is significant that while simultaneously of record as his lead counsel in South Carolina after the October 2007 trial verdict, Engelhard filed a Motion to Quash the Subpoena and Trial Testimony of his client LaGrand in a similar case, United States v. Moran, Case No. 2:02-cr-00423-JCC (W.D. Wash. 2007) in November/December of 2007. Petitioner further asserts that the testimony Engelhard sought to quash was the same testimony Petitioner needed in his trial. Petitioner finds it significant that the only attorney of record for LaGrand from 2004 until January 2008 in District Judge Coughenour's court in Seattle was Engelhard. Petitioner raises concerns about what he perceives as ethical violations by Engelhard in both his home state of Washington as well as here in South Carolina with regards to his failure to obtain certain waiver(s) required under the relevant ethical rules, including South Carolina Rules of Professional Conduct

---

[6]These three individuals co-authored a AAA tax planning book, "21st Century Tax Strategies and Structures."

Rule 1.7 and Washington State Court Rules: Rules of Professional Conduct, Rule 1.7. At the hearing, Petitioner offered the video deposition testimony of Professor John Freeman. In his affidavit submitted to the Court, which is consistent with his trial testimony, Professor Freeman opines:

> I am convinced as an expert in the legal ethics field that Mr. Engelhard, Dr. Dehlinger's lead counsel, labored under an actual conflict of interest, and that the attorney's misconduct in dealing with that conflict of interest adversely affected Mr. Engelhard's representation. Dr. Dehlinger's interests diverged from Mr. Engelhard's because, among other things, Dr. Dehlinger had a keen interest in having Ms. LaGrand take the stand at his trial, whereas Mr. Engelhard was committed to protecting Ms. LaGrand from having her complicity in fraud and her lack of credibility and prior false statements under oath exposed and probed. In my judgment, Mr. Engelhard's conduct was in flagrant violation of a host of ethical rules applicable to lawyers in South Carolina and in Washington State (Mr. Engelhard's home state), including Rule 1.1 (competence), Rule 1.4 (communication), Rule 1.7 conflict of interest), Rule 8.4(d) (conduct involving dishonesty, fraud, etc.), and Rule 8.4(e) (conduct prejudicial to the administration of justice).

> Affidavit of John Freeman dated October 25, 2010 ("Freeman Aff., 10/25/10"), ¶ 14, Petitioner's Ex. # 1.

Engelhard did not obtain a written waiver from Petitioner.[7] Petitioner argues that what he characterizes as simultaneous representation of him and these planners creates a conflict of interest.

Petitioner also argues that the alleged conflict of interest in this case had an adverse effect on Engelhard's representation of him. Petitioner asserts that as he was charged with willfully making and subscribing to false tax returns, the key element to his defense was willfullness; i.e. Petitioner asserts he needed to show the jury that he did not willfully make or subscribe to the false returns.

---

[7]This Court notes that the Sixth Amendment constitutional analysis is independent of attorney rules of professional conduct. Moss v. Kohn, 323 F.3d 445, 449 (6th Cir. 2003) (even where defense counsel's conduct was below "boundary of professional competence," petitioner failed to show conflict of interest adversely affected counsel's performance); see also Mickens, 535 U.S. at 176 (purpose of Cuyler v. Sullivan exception is "not to enforce the Canons of Legal Ethics"); Nix v. Whiteside, 475 U.S. 157, 165 (1986) (breach of ethical standard not tantamount to denial of defendant's Sixth Amendment rights).

Petitioner argues that the best way for him to combat willfullness was through LaGrand, a AAA planner, who he asserts had previously testified that her clients believed AAA's tax strategies to be legal. Petitioner argues that he never had the opportunity to present testimony of a AAA planner because of Englehard's unreasonable decision to not put LaGrand or Redd or any other planner on the witness stand to testify about what they told him, which he asserts formed the basis for his belief in the AAA system. Petitioner submits the affidavit of his co-trial counsel, Robert Stientjes, in which Stientjes indicates as follows:

> I asked Engelhard about Mr. Redd and he dismissed the inquiry essentially saying that Redd would not be useful. I later learned, in Seattle, that Redd had been a client of his, was a critical witness in the Moran case and would have been a critical witness in the Dehlinger case. Engelhard failed to disclose to me that Collis Redd was his former client. He also failed to disclose to me a second of the three authors of the book, Gary Kuzel, was also a former client of his. Adding in Tara LaGrand, Engelhard had represented all three authors of the book "Tax Magic."

> Until the last minute, Dr. Dehlinger expected Tara LaGrand, the third author of the book, to testify for Dr. Dehlinger. Engelhard said he could not put her on the stand because she was his client . . .Engelhard, as her attorney, said she would not take the stand . . .Only Engelhard had direct access to LaGrand, and we reasonably assumed he would use that relationship for the benefit of Dr. Dehlinger. I did not try to speak directly with her since she was Engelhard's client and I reasonably assumed he had talked with her to the extent necessary to put her on the witness stand. At trial Engelhard represented that her testimony would be harmful . . .At that point it became clear that keeping LaGrand off the stand was not just a trial strategy for Dr. Dehlinger, but clearly a strategy primarily focused on LaGrand's Assertion of the Fifth Amendment.

Stientjes Aff., 10/11/10, p. 2-3, Petitioner's Ex. # 7.

C.      The Government's Position

The Government opposes Petitioner's petition and argues that Petitioner fails to establish ineffective assistance of counsel under the Cuyler v. Sullivan standard. Specifically, the Government argues that Attorney Engelhard did not actively represent conflicting interests. The Government

asserts that Engelhard was court-appointed counsel at LaGrand's trial and had nothing to gain in October of 2007 by protecting her interests at the expense of the Defendant's interests. LaGrand was sentenced to prison more than two years before the Defendant's trial. Under 18 U.S.C. § 3006A, a "person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate judge or the court through appeal . . . ." Accordingly, the Government argues that Engelhard's representation of LaGrand was thus effectively over in the fall of 2005. To prevail under Cuyler v. Sullivan, the Government argues that Petitioner must do more than simply show that Engelhard's name remained on the docket, but instead he must show that Engelhard was actively representing LaGrand's interests at the time of his trial. The Government asserts that no evidence suggests that Engelhard did so. Additionally, the Government believes this to be a case of successive representation and argues that the written waiver Engelhard obtained from LaGrand when he undertook his representation of the Defendant obviated any concerns over the potential for exculpatory information learned from the first client to be unavailable to the second client based on obligations of client confidentiality to the first client.

As to Redd, the Government asserts that Petitioner's claim that Engelhard did not call Redd as a witness because he was actively representing Redd's interests is strained and warrants no relief. The Government asserts that Engelhard barely knew Redd. The Government argues that Engelhard states that he never had any substantive discussions with Redd, never met him in person before Defendant's trial, and had only three or four short telephone conversations with him involving no confidential information about AAA. The Government also asserts that Petitioner points to no exculpatory information learned from the representation of Redd that Attorney Engelhard could not use at the Defendant's trial based on confidentiality obligations to Redd.

Finally, the Government asserts that the claim that Engelhard failed to call Kuzel as a witness based on loyalty to him is similarly frivolous. Kuzel had separate counsel at the Seattle trial, who also successfully won a mistrial for Kuzel. Attorney Engelhard was thus not actively representing Kuzel's interests at the time of the Defendant's trial, nor at any time since at least January 2003. Kuzel had his own counsel, who represented him. As was the case with Redd, the Government asserts that Engelhard did not have access to any confidential information learned from the representation of Kuzel that would have benefitted the Defendant at his trial.

As to Engelhard's brief and limited representation of LaGrand in November and December of 2007, the Government argues that this representation does not show that Engelhard was representing her interests throughout Petitioner's trial. LaGrand did not contact Attorney Engelhard until late November of 2007, after Petitioner's trial was over. At the time of the Petitioner's trial, the defense team in the Moran case had not issued any subpoenas to LaGrand. The Government indicates that Engelhard's re-appointment on November 29, 2007, which was docketed on December 5, 2007 is evidence that Engelhard was not actively representing LaGrand's interests throughout the Petitioner's trial.

Additionally, the Government argues that Petitioner has not shown any adverse effect on Engelhard's performance as a result of any conflict. As stated above, to show that a conflict caused an adverse effect on Engelhard's performance, the Petitioner must show that a plausible, objectively reasonable alternative strategy was not taken and must link the failure to take that strategy to the conflict of interest. The Government argues that the alternative strategy posited by the Petitioner, i.e. the procuring of trial testimony by one or more of the three AAA planners LaGrand, Redd, or Kuzel to the effect that he or she believed that the AAA tax schemes were legitimate, thus lending credibility

to the Petitioner's good-faith defense, is neither plausible nor objectively reasonable. The Government asserts that (i) as to LaGrand, the primary reason that LaGrand's testimony was not a plausible (nor objectively reasonable) trial strategy was because LaGrand would have asserted her right against self-incrimination if subpoenaed for testimony, regardless of who represented her and (ii) no evidence suggests LaGrand would have waived her privilege if the Defendant had subpoenaed her at trial and she had been advised by any competent defense attorney. Eisemann v. Herbert, 401 F.3d 102, 109 (2nd Cir. 2005) (proposed witness's privilege against self-incrimination, as well as lack of evidence about content of witness's proposed testimony, explained failure of counsel to call proposed witness at trial, instead of any conflict of interest). The Government indicates that during her trial in 2004, in the hopes of being acquitted, LaGrand testified that the AAA programs were legitimate. After a mistrial was declared, she pled guilty, under the terms of a favorable plea agreement. That plea agreement included, however, an admission that she prepared fraudulent returns for her AAA clients. If LaGrand had testified at the Defendant's trial that the programs were legitimate, she would have arguably breached her plea agreement and could have been subject to prosecution for her other crimes. Kuzel pled guilty under nearly identical circumstances. Notably, the Government asserts that the Defendant has not cited any instance of LaGrand or Kuzel (or Bridges, the third planner as to whom the Seattle jury deadlocked) having testified at trial in the subsequent prosecutions of AAA clients.

As to Kuzel and Redd, the Government also argues that they were also implausible witnesses because they never had any substantive discussions with the Petitioner. Their own purported beliefs about the legitimacy of the AAA tax schemes were irrelevant to the issue of whether the Defendant acted willfully. Nor would Redd or Kuzel be permitted under the rules of evidence to speculate on

the Defendant's state of mind. Fed. R. Evid. 701 (lay witness opinion must be rationally based on perception of witness); <u>United States v. Hauert</u>, 40 F.3d 197, 201 (7th Cir. 1994) (lay witness testimony inappropriate as to criminal tax defendant's state of mind).

Finally, the Government asserts that even if LaGrand, Redd, and Kuzel were deemed to be witnesses whose testimony constituted a plausible and objectively reasonable defense strategy, the Petitioner fails to show any link between Engelhard's decision not to call those individuals as witnesses and any conflict of interest. It is this latter position argued by the Government, that there is no link between Engelhard's decision not to call the witnesses discussed above and any conflict of interest, that the Court finds most persuasive in deciding the issue for relief.

D.     Relevant Case Law

This Court has carefully reviewed many cases in its effort to reach a decision in this matter. Many of these cases involved serious charges and set forth detailed analyses regarding whether a conflict existed, and if so whether it "adversely affected" counsel's performance. Trial strategy is an issue in a number of these cases. It is appropriate to generally outline certain cases considered by this Court relevant to its analysis herein.

In <u>Mickens v. Taylor</u>, 240 F.3d 348 (4th Cir. 348), the Fourth Circuit (after a rehearing en banc) affirmed the denial of the habeas relief sought by the defendant/petitioner Walter Mickens, Jr. Mickens was convicted of the capital murder of Timothy Hall and was sentenced to death. Mickens' federal habeas attorney later discovered during the preparation of Mickens' federal habeas corpus petition that Mickens' trial counsel had represented the victim Hall on a charge unrelated to Hall's death. The trial judge was on notice of this fact because she was "the same judge who handled the dismissal" of the case against the murder victim. The trial judge did not, however, inquire into the

possible conflict of interest. Moreover, defense counsel did not tell the defendant that he had previously represented the victim, thus precluding the defendant from making an objection. Mickens argued that, because of this prior representation, his attorney labored under a conflict of interest that rendered his representation of Mickens inadequate to satisfy Mickens' Sixth Amendment guarantee of effective counsel. Specifically, Mickens presented three alternative arguments for habeas corpus relief on conflict of interest grounds. First, Mickens argued that the trial court's failure to inquire into the extent of his attorney's potential conflict of interest even though the court reasonably should have known of the conflict mandated automatic reversal of his conviction. Second, Mickens argued that even if the trial court's failure to inquire into his attorney's potential conflict did not require automatic reversal, it relieved him of his burden under Cuyler v. Sullivan of establishing that the conflict of interest adversely affected his representation. Finally, Mickens argued that he satisfied both elements of the two-part Cuyler v. Sullivan test and that the district court erred in ruling that his attorney did not labor under an actual conflict of interest that adversely affected his representation. The Fourth Circuit concluded that Cuyler v. Sullivan required Mickens to establish both an actual conflict of interest and an adverse effect even if the trial court failed to inquire into a potential conflict about which it reasonably should have known. The Court adopted a three part standard for evaluating adverse effect, and concluded that Mickens failed to show an adverse effect on his counsel's performance. Accordingly, the Fourth Circuit affirmed the decision of the district court and denied Mickens' petition, without deciding whether Mickens demonstrated that his attorney labored under an actual conflict of interest.

The United States Supreme Court affirmed the decision of the Fourth Circuit Court of Appeals and held that in order to demonstrate a Sixth Amendment violation where the trial court fails to

inquire into a potential conflict of interest about which it knew or reasonably should have known, a defendant must establish that a conflict of interest adversely affected his counsel's performance. Mickens v. Taylor, 535 U.S. 162, 173-174 (2002). In its decision, the Supreme Court clarified that "the Sullivan standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." 535 U.S. at 172 n. 5.

In another noteworthy case, Stephens v. Branker, 570 F.3d 198 (4th Cir. 2009), defendant/petitioner Davy Gene Stephens appealed from the district court's dismissal of his 28 U.S.C. § 2254 petition for a writ of habeas corpus, which challenged his three North Carolina murder convictions and death sentences, as well as three related felony convictions and sentences. In his petition, Stephens raised a conflict of interest claim based on the fact one of his court appointed trial attorneys, W.A. "Andy" Holland, Jr., also represented the Sheriff of Johnson County in connection with an Equal Employment Opportunity Commission complaint. In the state court proceedings, Stephens argued that Holland had "an obvious conflict of interest" because he was concurrently representing "the very law enforcement agency that gathered the evidence and was otherwise instrumental in prosecuting [Stephens]." Id. at 202. The Fourth Circuit affirmed the District Court's denial of habeas relief. In evaluating Stephen's conflict claim, the Court concluded that the state court's determination on the merits of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Further, that order was not based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1). In its assessment of the case, the Fourth Circuit concluded that even assuming Holland labored under a conflict at the time of trial, Stephens was not entitled to habeas relief because he failed to show that the conflict adversely

affected Holland's trial performance. The Court found that Stephens failed to satisfy the three factor adverse effect test established in Mickens. In analyzing the third Mickens factor (that the petitioner show the attorney's decision not to pursue [a plausible, objectively reasonable] strategy was linked to the conflict), the Court specifically noted that although petitioner contended that his counsel should have done more, "he fails to demonstrate that the trial decisions made by his counsel were anything other than tactical judgments." Stephens v. Branker, 570 F.3d at 212. (emphasis added). The Court elaborated as follows:

> For instance, Stephens faults Holland for failing to question Detective Berube about the police corruption theory at trial. Stephens asserts that Holland's failure to call Berube is illustrative of Holland's ineffective representation, but it is entirely reasonable to assume that Holland did not call Berube to testify *because* Berube was so deeply involved in the murder investigation. The prosecution's cross-examination could well have introduced potentially damaging evidence and, absent convincing proof of Berube being "in cahoots" with the drug dealers, it is quite possible that the jury would not have been persuaded by Holland's questioning. Further, Holland's testimony at the evidentiary hearing on the conflict claim supports the conclusion that his trial strategy with respect to Berube was based solely on a tactical decision. Before trial, Holland questioned Berube about his investigation of the Grill Road crack house and concluded that Berube simply did not have anything to hide. Absent some reason to believe that Berube could support the corruption theory, it is reasonable that Holland declined to question him at trial.

> Id.

This Court has also carefully considered and finds instructive the cases of Nicholson I and Nicholson II. In United States v. Nicholson, 475 F.3d 241 (4th Cir. 2007) (Nicholson I), defendant/petitioner Nicholson appealed the District Court's denial of his 28 U.S.C. § 2255 petition to the Fourth Circuit Court of Appeals. Nicholson asserted that his lawyer was operating under an actual conflict of interest at his August 29, 2001 sentencing hearing because, at that time, Nicholson's lawyer, Jon Babineau, was representing Nicholson as well as another client, Lorenzo Butts. Butts had

previously threatened to kill Nicholson and his family, had attempted to kill Nicholson's brother, and had already killed Nicholson's step-father. Nicholson, who was convicted of a federal offense for his possession of a firearm and ammunition by a felon, asserted that he carried the handgun to protect himself from Butts. Nicholson maintained that Babineau, during the sentencing proceedings, failed to request a downward departure based on Nicholson's need to carry the handgun because, in so doing, Babineau would have accused his other client (Butts) of uncharged criminal conduct. Nicholson asserted that an actual conflict of interest existed and that it adversely affected the performance of his lawyer during the sentencing proceedings in contravention of his Sixth Amendment right to the effective assistance of counsel. The district court denied relief on petitioner's 28 U.S.C. § 2255 petition, without conducting a hearing. In so ruling, the district court concluded that Babineau's simultaneous representation of Butts and Nicholson did not create an actual conflict of interest because Babineau was not representing Nicholson and Butts in cases arising from the same set of circumstances. The district court further concluded that, even if there was a conflict of interest, any necessity defense interposed by Nicholson at trial would have been unsuccessful. The district court did not address whether it would have been objectively reasonable for Babineau to seek a downward sentencing departure based on necessity and self-defense.

On appeal, the Fourth Circuit, in assessing Nicholson's actual conflict of interest claim, concluded that, "[c]ontrary to the district court's ruling," lawyer Babineau's simultaneous representation of Nicholson and Butts created a conflict of interest. Nicholson I, 475 F.3d at 249. The Court explained that "Nicholson's interests, on the one hand, and Butts's interests, on the other, were in total opposition to each other during Babineau's simultaneous representation of them." Id. at 249-50. This simultaneous representation placed Babineau "in the position of having to make claims

against Butts in order to pursue a downward departure motion, on the basis of self-defense necessity, in Nicholson's sentencing hearing." Id. at 251. "Babineau had to 'pull his punches' at Nicholson's sentencing hearing in order to avoid accusing his other client, Butts, of uncharged criminal conduct." Id. Because Babineau was "in the untenable position of having to place the interests of one client (either Butts or Nicholson) above another (either Nicholson or Butts)," Babineau was impaired by a conflict of interest during Nicholson's sentencing proceedings. Id. Accordingly, the Court reversed the district court's ruling that a conflict of interest did not exist. Id. at 252.

As to the issue of whether Babineau's conflict adversely affected his performance in Nicholson's sentencing proceedings, the Fourth Circuit observed that a § 2255 petitioner must satisfy, by a preponderance of the evidence, the three-part standard established in Mickens v. Taylor, 240 F.3d 348 (4th Cir.2001) (en banc), aff'd without consideration of this point, 535 U.S. 162 (2002). See Nicholson I, 475 F.3d at 251-52. More specifically, the Court explained:

> He must, first of all, "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued." [ Mickens, 240 F.3d at 361]. Second, he must establish that "the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision." Id. In order to satisfy this second prong, "the petitioner must show that the alternative strategy or tactic was 'clearly suggested by the circumstances.' " Id. (quoting [ United States v. Tatum, 943 F.2d 370, 376 (4th Cir.1991))]. Lastly, he must show that "the defense counsel's failure to pursue that strategy or tactic was linked to the ... conflict." Id. In establishing these three aspects of this test, the petitioner is not required to show that the strategy or tactic not taken would have been successful, but only that it would have been objectively reasonable. See id.

Nicholson I, 475 F.3d at 252.

The Court observed that " 'much of the adverse effect inquiry is heavily fact dependent,' " and that we generally must "defer to a habeas court's findings of fact." Id. (quoting Mickens, 240 F.3d at 360). However, the Court recognized that the district court here "did not conduct a hearing and

resolve the disputed factual contentions," nor did it "reach and address whether Babineau's conflict adversely affected his performance in Nicholson's sentencing proceedings." Id. As such, the Court remanded the case to the district court for a determination and assessment of the relevant facts on the adverse effect issue. Id. On remand, the district court ruled that the conflict had not adversely affected the lawyer's performance and, thus, again deemed Nicholson's claim to be without merit. Petitioner appealed again.

In United States v. Nicholson, 611 F.3d 191 (4th Cir. 2010) (Nicholson II), the Fourth Circuit reversed the district court's denial of § 2255 relief and remanded the case for resentencing. In doing so, the Court found that petitioner met his burden of proof as to the first and second Mickens prongs. As to the third Mickens prong, the Court, after a detailed discussion of the Eleventh Circuit case of Freund v. Butterworth, 165 F.3d 839 (11th Cir.1999) (en banc) noted:

> The question now before us is whether Babineau's conflict of interest had an adverse effect on Nicholson. If Babineau had zealously advocated for a self-defense departure, it is unlikely that Nicholson could demonstrate that he was harmed by the conflict (though Butts might have a viable Sixth Amendment claim). The fact is, however, that Babineau did not move for a self-defense departure on Nicholson's behalf. Viewed in this context, it is "self-evident" that Babineau was possessed of a conflict of interest that was inescapably-and, indeed, inherently-linked to the alternative defense strategy not pursued: moving for a self-defense departure. In other words, the competing interests of Nicholson and Butts were plainly stuck to Babineau's tactical considerations with respect to the self-defense departure motion-that is, Babineau's conflict of interest was inextricably woven into the alternative defense strategy. Indeed, it was an essential characteristic and attribute thereof. Thus, Babineau's conflict of interest was inherently linked to the tactic of moving for a self-defense departure motion on Nicholson's behalf-unlike other alternative defense strategies that could be conjured up, such as (from the example discussed above) a health-related departure motion, which would not have required Babineau to act contrary or disloyal to the "inconsistent" interests of his other client Butts.

Nicholson II, 611 F.3d at 215-216.

The Fourth Circuit concluded that because a self-defense departure motion was inherently in conflict with Butts's interests, Nicholson proved-by much more than a preponderance of the evidence-the necessary link between Babineau's conflict of interest and his failure to move for a self-defense departure, thus satisfying the third and final <u>Mickens</u> prong.  <u>Id</u>.  Having concluded that Nicholson met his burden of proof on all three of the <u>Mickens</u> prongs, the Court granted § 2255 relief-specifically, a remand for resentencing.  <u>Id</u>.

In <u>United States v. Sheppard</u>, 121 Fed.Appx. 508 (4th Cir. 2005), the petitioner claimed that he had not received effective assistance of counsel because his appellate counsel, Attorney McCullough, was operating under a conflict of interest. Petitioner alleged that this conflict arose because Attorney McCullough's role as Sheppard's appellate counsel required him to attack the very sentence he had argued for during his tenure as an AUSA, when he handled defendant's sentencing hearing on behalf of the government.  The District Court denied relief.  The Court of Appeals vacated and remanded the case and held that defendant was entitled to an evidentiary hearing on his claim that he was denied his Sixth Amendment right to counsel because his counsel was operating under a conflict of interest.

Finally, in <u>Rubin v. Gee</u>, 292 F.3d 396 (4th Cir. 2002), petitioner, a Maryland prisoner, claimed she was denied the effective assistance of counsel and sought federal habeas corpus relief. The district court granted a writ of habeas corpus, concluding that the state court's decision not to grant Rubin a new trial was an objectively unreasonable application of clearly established federal law regarding Rubin's right to conflict-free representation.   The Fourth Circuit agreed and concluded that because two of Rubin's attorneys labored under a conflict of interest that adversely affected Rubin's representation, and because Rubin was denied the assistance of counsel by these lawyers' corruption

of the attorney-client relationship from the night of Rubin's crime until the conclusion of Rubin's trial, the relief granted by the district court was warranted. The Court summarized the attorneys conduct as follows:

> The case involved two attorneys who in the aftermath of a crime schooled their client in the tactics of evasion in order to guarantee their own fee. Then to avoid criminal indictment and keep their conduct from coming to light, the attorneys took cover as part of the defense team. While the prosecution harped at trial on Rubin's actions immediately following the crime, the attorneys could not be called as fact witnesses and their role in directing Rubin's actions was never explained. To say this had an adverse impact on her trial is self-evident. To say the actions here tarnished the noble calling of criminal defense work is an understatement.

Id. at 398.

E.      Analysis

After careful consideration of the above cited case law and the standards initially articulated in Cuyler v. Sullivan and later refined in Mickens v. Taylor, 535 U.S. 162 (2002), the Court will now apply the relevant law to the facts of this case. As an initial matter, the Court will first briefly address potential witness Kuzel and potential witness Redd. As to both of these witnesses, this Court is not sufficiently persuaded that Attorney Engelhard operated under a conflict of interest. With regards to Kuzel, this Court finds that Engelhard was not actively representing Kuzel's interests at the time of the Defendant's trial. Kuzel had separate counsel, Joseph E. Rowland, at the Seattle trial, who also successfully won a mistrial for Kuzel. Engelhard testified at the evidentiary hearing concerning Kuzel:

> Q.      Okay. And did Mr. Rowland ever contact you on behalf Mr. Kuzel indicating that there was any kind of conflict of interest concern?

A.     Yeah. I talked to him and his client about that initial contact, and Mr. Kuzel made clear that he didn't feel like I had represented him. So he didn't see that there was any conflict or a need for a waiver or anything of the sort.

Evidentiary Hearing Testimony of Engelhard, December 19, 2011. Tr. p. 103

This testimony is essentially unrebutted in the record. Similarly, as to Redd, the Court finds that Engelhard was not actively representing Redd's interests at the time of the Defendant's trial. Despite Redd's testimony that he "believed" Engelhard to be his lawyer, the Court finds this testimony unpersuasive and not critical to the ultimate analysis. Engelhard and Redd barely knew each other and never had any significant legal relationship between them. At most, the evidence establishes that they had three or four telephone conversations. They never met in person.[8] However even assuming a potential conflict as further discussed below, the Court is not sufficiently persuaded that there is any link between Engelhard's decision not to call Redd and Kuzel and any conflict of interest.

For purposes of its analysis as to witness LaGrand, this Court will assume arguendo, that Engelhard did represent LaGrand as outlined, and that Petitioner raises a potential conflict of interest based on that representation.[9] However, for the reasons set forth, the Court is not sufficiently

---

[8] Collis Redd testified at the evidentiary hearing that he had never met Engelhard. Evidentiary Hearing Testimony of Collis Redd, December 19, 2011, Tr. p. 209.

[9] The Court notes that Engelhard testified that shortly before the Defendant's trial, and after the trial in November of 2007 (before he was re-appointed in her case), he advised LaGrand that he was not her lawyer. Evidentiary Hearing Testimony of Engelhard, December 19, 2011, Tr. pps. 107, 117. Email correspondence between LaGrand and Engelhard commencing August 28 of 2007 and ending November 14 of 2007 provides as follows:
Email from LaGrand:
"It is all behind me but I would like to keep updated. Is there any way I can reach Tony Gasaway? I sent a letter to an address I found with no luck. Thanks, Tara."
Response from Engelhard:
"Tara, the new attorneys for Jim and Pam Moran have asked to contact you. Even though I don't represent you, I'm not going to give them your contact information unless you say it's

29

persuaded that Petitioner has shown that the potential conflict ripened into an actual conflict of interest, as it is defined under the case law.[10]  The Court is not sufficiently persuaded that any potential conflict adversely affected counsel Engelhard's performance in this case.  As previously outlined, to establish adverse effect, a defendant must show (i) the existence of a plausible, alternative defense strategy or tactic that his defense counsel might have pursued; (ii) the objective reasonableness of that alternative strategy under the circumstances of the case, meaning that such strategy was "clearly suggested by the circumstances;" and (iii) linkage between the failure of defense counsel to pursue that strategy or tactic and the conflict of interest.  Nicholson II, 611 F.3d 191 (4th Cir. 2010) (citing Mickens v. Taylor, 240 F.3d 348 (4th Cir. 2001)).  Even if the Court were to accept Petitioner's position that he has shown the existence of a plausible, alternative defense strategy or tactic that his defense counsel might have pursued which was objectively reasonable, this Court is not persuaded that there has been a showing of the requisite link between the failure of defense counsel to pursue that strategy or tactic and the conflict of interest.  See generally, Nicholson II, 611 F.3d at 212-216 (discussing the third prong of the Mickens standard in connection with the case of Freund v. Butterworth, 165 F. 3d 839 (11th Cir. 1999)(en banc)).  Accordingly, for the reasons outlined below,

---

okay. Jim and Pam are set for trial in early December. I suspect that they are trying to decide whether or not to call you as a witness. I hope you are well. Scott."
Response from LaGrand:
"Well, what is my exposure? I am doing okay. This working for a living is killing me. I kind of got used to doing personal enrichment chores at camp. How is the client lawsuits going? Tara."
Government's Ex. # 3.

[10]See Nicholson II, 611 F.3d at 196, n. 2.  In order to prevail on an actual conflict of interest claim, a petitioner must show that (1) petitioner's lawyer operated under a "conflict of interest" and (2) such conflict "adversely affected his lawyer's performance."

the Court does not find that Engelhard had a conflict of interest that adversely affected his performance at trial.  See id.

Most significantly, this Court finds that Engelhard's decision to not call any of these three witnesses, including LaGrand, was based on trial strategy.  The record supports this conclusion and a finding that the trial strategy in Petitioner's case was consistently adhered to in the early pretrial stages of the case as well as on the eve of trial and during the trial of the case itself.  The record also supports a conclusion that Defendant Dehlinger was aware of Engelhard's trial strategy to keep convicted felons and unfavorable witnesses off the stand.  Before trial, Engelhard told the Defendant Dehlinger that, for strategic reasons, he did not intend to call LaGrand (or any other planner) as a witness.  Engelhard told the Defendant that if the Defendant wanted to call LaGrand as a witness, then the Defendant needed to obtain other counsel.  Engelhard Aff., 8/11/08,  ¶¶ 15-17, Petitioner's Ex. # 5.  Engelhard was well qualified to make such a determination because he had been involved in the AAA case in Seattle for several years and had represented LaGrand during a lengthy trial in which promoters, clients, and experts testified. Despite the assertions by Stientjes and the Defendant in support of the Petition, the available evidence shows that the defense team never had any serious intentions to call LaGrand as a witness. Stientjes does claim that "[u]ntil the last minute, Dr. Dehlinger expected Tara LaGrand  . . . to testify for Dr. Dehlinger." Stientjes Aff., 10/11/10, p. 2, Petitioner's Ex. # 7.  However, this claim, accepted by Professor Freeman, is contradicted by the evidence submitted at the evidentiary hearing as well as the available contemporaneous evidence.

The Court's conclusions are supported by various portions of the records. As an initial matter, the Court has examined the two affidavits of Attorney Stientjes.  In an email dated March 3, 2008, some five months after trial, Attorney Stientjes submitted a "draft" affidavit to Engelhard for

comments before he submitted the affidavit to Stanley D. Monroe, Petitioner's counsel at sentencing. This affidavit, prepared in close proximity to the relevant events in the case, was never signed, but was admittedly prepared by Stientjes, in conjunction with Stanley D. Monroe and an associate in Stientjes' office. Notably, in Paragraphs 9-11 of the draft affidavit, it indicates that:

> 9.  Before Engelhard was retained to assist my law firm with Dehlinger's case, Engelhard disclosed to Dehlinger his previous representation of LaGrand. He also disclosed the potential for the United States to object to his representation of Dehlinger due to a conflict of interest stemming from his previous representation of LaGrand. In addition, Engelhard disclosed to Dehlinger and I that he could not represent Dehlinger if LaGrand was called as a witness.

> 10. Before Engelhard was retained of counsel by my law firm to represent Dehlinger; Engelhard, Gasaway, Dehlinger, and I had discussions regarding whether LaGrand would be a good witness to testify on behalf of Dehlinger. Engelhard stated that he believes that LaGrand would be a bad witness for Dehlinger. Engelhard represented that his rationale for such belief is due to the fact that LaGrand is a convicted felon who could, therefore, be viewed as untrustworthy by a jury. Engelhard represented his belief that other witness, who do not have criminal records, could testify to the same facts as LaGrand. These witnesses were Dr. Bruce Burner and Carl Charlot.[11] Gasaway and I agreed with Engelhard's assessment, and we mutually recommended to Dehlinger that LaGrand should not be called as a witness in this case. Dehlinger agreed to follow our advice.

> 11. Engelhard was subsequently retained "of Counsel" by my law firm to represent Dehlinger.

Draft Stientjes Aff. 3/08"), ¶¶ 9-11, Government Ex. # 2.

---

[11]The Court notes that Bruce Burner and Carl Charlot are actually the witnesses that were called during the trial of this case.

However, in a signed affidavit executed October 11, 2010, three years after the conclusion of this trial, Stientjes avers that "[u]ntil the last minute Dr. Dehlinger expected Tara LaGrand, the third author of the book, to testify for Dr. Dehlinger."  Stientjes Aff., 10/11/10, p. 2, Petitioner's Ex. # 7.  When questioned at the evidentiary hearing by the Government's attorney about the apparent inconsistencies between these two documents, attorney Stientjes responded:

A.    Well, to explain the point, based on Scott Engelhard's representation, Tara LaGrand would not be a good witness. And I supported his decision. And it was recommended to Dr. Dehlinger that she wouldn't be called.

Q.    Even your statement there disagrees with your sworn affidavit, "Until the last minute Dr. Dehlinger expected Tara LaGrand, the third author of the book, to testify for Dr. Dehlinger." That is not true, is it?

A.    If I could explain. The -- my understanding of the situation at the time of trial was we don't want to call her. We're not going to call her. If something comes up where we need to bring her in, then she would be available as such. But it was our intent or at least it was our trial strategy leading up to the trial that she would not be called. That was the strategy that Scott Engelhard had recommended, and I had backed him up.

Q.    But even now you are describing a contingency scenario that runs counter to, "Until the last minute Dr. Dehlinger expected Tara LaGrand to testify for Dr. Dehlinger." An expectation is not a contingency; do you agree?

A.    Well, I think it would be better to say he expected her to be available if necessary.

Evidentiary Hearing Testimony of Robert J. Stientjes, December 19, 2011, Tr. pps. 300-301.

Further inquiry was made by the Court of Stientjes regarding certain portions of this draft affidavit:

THE COURT:        In the draft affidavit that has not been signed but it has been filed, it says that, at paragraph 10, "Before Engelhard was retained of counsel by my firm to represent Dehlinger;

Engelhard, Gasaway, Dehlinger, and I had discussions regarding whether LaGrand would be a good witness to testify on behalf of Dehlinger." Is that accurate or not? Is that true or not?

THE WITNESS:     That's true, yes.

THE COURT:      It then says further that "Engelhard stated that he believes that LaGrand would be a bad witness for Dehlinger." Is that true or not?

THE WITNESS:     That is true.

THE COURT:      "Engelhard represented that his rationale for such belief is due to the fact -- due to the fact that LaGrand is a convicted felon who could, therefore, be viewed as untrustworthy by a jury." Is that accurate?

THE WITNESS:     That is what he said, yes.

THE COURT:      It then says further, "Engelhard represented his belief that other witnesses, who do not have criminal records, could testify to the same facts as LaGrand." Is that true or not?

THE WITNESS:     That is true.

THE COURT:      "These witnesses were Dr. Bruce Burner and Carl Charlot. Gasaway and I agreed with Engelhard's assessment, and we mutually recommended to Dehlinger that LaGrand should not be called as a witness." Is that accurate?

THE WITNESS:     It is in a sense that -- I would hate to say that occurred way back in 2006 when the representation first began. Throughout the trial preparation process, we certainly had these kind of discussions. And –

THE COURT:      So -- go ahead.

34

THE WITNESS:        And so, yes, during the year 2007 these discussions occurred.

THE COURT:          Well, it says this: "Gasaway and I agreed with Engelhard's assessment, and we mutually recommended to Dehlinger that LaGrand should not be called as a witness." Is that accurate or not?

THE WITNESS:        That is accurate. The only way – the only thing I would say about that is I was relying on what Scott had said about why she shouldn't be called. I think I have said enough that I haven't -- I had never spoken to her at that point. I didn't do my own separate evaluation.

THE COURT:          The last sentence in paragraph 10 says that "Dehlinger agreed to follow our advice." Is that accurate or not?

THE WITNESS:        Yes, yes. I mean by the time we were leading up to trial, we had advised that she shouldn't be called. And again, unless something came up and it was necessary, I think up -- leading up to trial he was in agreement with what our strategy was, and it really was – certainly before trial he was nervous and he wanted to do something different, wanted to call other people.

Evidentiary Hearing Testimony of Robert J. Stientjes, December 19, 2011, Tr. pps. 313-315.

Additional questioning of Stientjes about LaGrand elicited the following testimony:

THE COURT:          And then at some point during this process did you feel like Tara LaGrand should have been called as a witness?

THE WITNESS:        When we were at trial and Erik wanted her to be called, I essentially -- what I stated was Erik has the final say. Up until that point, I was agreeing with what Scott Engelhard had decided, which was we won't call her if we don't need to.

THE COURT:          Well, at some point did you believe that she should have been called as a witness?

THE WITNESS:       I believe she should have been called as a witness because Dr.
                   Dehlinger was adamant that he wanted her to be called.


THE COURT:         So it was based on what he wanted as opposed to your
                   evaluation as to whether or not she would be a good or a bad
                   witness?


THE WITNESS:       That is true.

Evidentiary Hearing Testimony of Robert J. Stientjes, December 19, 2011, Tr. pps. 312-313.

Scott Engelhard executed an affidavit which has been presented in this case dated August 11,

2008.  Engelhard also testified at the evidentiary hearing.  Notably, in paragraph 13 of his affidavit,

Englehard indicates that "Dr. Dehlinger and Mr. Stientjes were well aware of my previous

representation of Tara LaGrand.  In fact, Mr. Dehlinger sought my  services largely because of my

work for Ms. LaGrand."  Engelhard Aff., 8/11/08", ¶ 13, Petitioner's Ex. # 5.  On direct examination

at the evidentiary hearing the Government questioned Engelhard about this statement as follows:

Q.      Would you explain that statement in your affidavit?


A.      Well, as I was told, they wanted me to be one of the trial lawyers because of
        my experience with the case, with the Anderson's Ark generally, and the fact
        that I had been considered successful at least in getting a hung jury as far as
        Tara LaGrand.


Q.      And was there any communication or understanding at that point that you
        would obtain Ms. LaGrand's testimony in support of Dr. Dehlinger?


A.      No. Just the opposite.


Q.      Would you explain that, please?

36

A. I made it clear to both Rob and to Dr. Dehlinger that in my view it would not be a good strategic decision to call Tara LaGrand as a witness. And that if that's the way they wanted to go, they really should go with some other lawyer.

Q. Now, at this point, Ms. LaGrand was in jail; is that right?

A. I believe so, yeah.

Q. In August of 2006.

A. Right. She was in prison.

Q. Were you representing her? Were you her lawyer?

A. No.

Q. And so when you are making these -- having these discussions with Dr. Dehlinger and Rob Stientjes, are you doing that as part of an objective assessment of the evidence that you would have to put on during trial?

A. Yes.

Q. Do you think Ms. LaGrand would have been a good witness?

A. No.

Q. Why not?

A. Well, there are a variety of reasons for that. One is the fact that she testified that she was completely innocent but then later entered a guilty plea, and so there is an inconsistency there that I think would potentially be exploited on cross examination. Secondly, she – as she testified in her trial, she explained to the jury that she was an inexperienced accountant in corporate matters, offshore matters, really had only done work for filing generic 1040s for individuals. And it was my opinion that a good prosecutor could probably

make her look like someone that nobody should believe as a planner in complicated matters like this. So I thought that it would be to Mr. Dehlinger's detriment to call someone like her as a witness. Finally, I was concerned that because of my prior representation of her, that even if there was some sort of caution to her that she not mention the fact that I had previously represented her, if -- if somehow that came out through a document or some inadvertent statement of her or someone else, that that would prejudice the jury against me and, thus, Dr. Dehlinger. And so I saw huge potential pitfalls for calling her as a witness. At the same time, it seemed to me that the benefit of having her testify would be very, very small potential benefit and the risks were very, very large.

. . . .

Q. Now, before trial you ran through a number of possibilities as far as witnesses go. And did you consider calling other planners beyond Tara LaGrand?

A. I -- I did consider that. I will say this: I felt pretty clear in my mind before I even started to represent Dr. Dehlinger that I was not going to call any planners because I didn't think it was a good idea. But nonetheless, I considered it. I discussed it at length with Rob Stientjes. I called I believe it's George Benoit on a couple of occasions, talked to him about possibly coming to testify. And I know that Rob Stientjes and I talked about possibly calling other planners, but it always came back to me to the same conclusion, that the risks of calling a planner far outweighed the benefits for someone like Dr. Dehlinger.

Evidentiary Hearing Testimony of Scott J. Engelhard, December 19, 2011, Tr. pps 106-108; pps. 109-110.

The signed affidavit of Engelhard, and the signed and unsigned draft affidavit of Stientjes, viewed in conjunction with these individuals' testimony at the evidentiary hearing during which the Court was able to evaluate the credibility of the witnesses, lead this Court to conclude that from the very outset of any representation of Petitioner by Engelhard, the trial strategy that was discussed and agreed upon with regards to LaGrand was that she would not be a good witness and would not be called by the defense in Dehlinger's case. Having observed Engelhard's demeanor when questioned

about the decision not to call certain witnesses, the Court finds Engelhard's testimony, which is corroborated by the other evidence noted herein, to be persuasive and credible. This position is further supported by contemporaneous e-mails between Defendant and his two counsel from September of 2007, which are consistent with Engelhard's proffered strategic assessment regarding these witnesses.

Attorney Stientjes's e-mail of September 20, 2007 directly contradicts the claim that "[u]ntil the last minute, Dr. Dehlinger expected Tara LaGrand . . . to testify for Dr. Dehlinger." Stientjes Aff., 10/11/10, p. 2-3, Petitioner's Ex. # 7. That day, the Defendant asked Attorneys Engelhard and Stientjes about trial witnesses, including Benoit, Marks, and LaGrand. The Defendant wrote:

> What about George Benoit? And, you still think Marks and/or LaGrand would be too risky? Marx could remember that my plan for 2001 was actually moving away from AAA and doing Real estate and another business venture that I was planning. Marx wanted to do my various ideas through the trust, or the LLC in Nevada, but I didn't want that. He was going to set me up new Corps and/or LLC's for these business ideas.

> Petitioner's Ex. # 15.

The Defendant's words – "you still think"– implies that his lawyers previously advised him against calling Marks or LaGrand as witnesses. Stientjes responded to the Defendant's e-mail by stating that he did not view additional witnesses as necessary or desirable. Specifically, Attorney Stientjes stated:

> Scott and I have talked about the benefits and burdens of each witness. We can discuss when you and I have a chance to talk . . . hopefully sooner rather than later. Call me stupid, but I think we have a great defense with our core witnesses. I think we only have risk in calling any more. But let's discuss to put your mind at ease.

> Petitioner's Ex. # 15.

In further email correspondence also on September 20, 2007, from Erik Dehlinger to Rob Stientjes and Scott Engelhard with the subject of other witnesses, Dehlinger writes:

"Scott and Rob, from our prior discussions, I assumed that George Benoit would be an important witness for us? He filled out my tax returns with Marks and propagated the AAA plans. He was hoping to become one of the planners. And he isn't under any criminal guise, and yet, I am. Isn't that important?"

Dan Luczkow's [sic][12] said that his attorneys in San Antonio had a lot of other important information we could use in our trial. Dan said that they had another accountant, beyond Benoit, involved with AAA that was ready to testify that no clients could have been aware of the illegal actions behind the scenes.

Erik.

Petitioner's Ex. # 15.

Engelhard responded to Dehlinger, and copied Stientjes:

After talking to George Benoit myself and discussing the possibility of calling him as a witness with Rob and with Luczkow's attorneys, I have concluded that we should not call him as a witness, the potential risks outweigh the benefits.

At the same time, we will not shy away from talking about Benoit at trial. Since he was never charged with a crime, it appears that the government has concluded that

---

[12]The Government indicates in their brief that Daniel and Mary Luczkow, defendants in United States v. Luczkow et ux., No. SA-06-CR-517-WRF (W.D. Tex.), also purchased AAA's tax fraud schemes. The indictment charged them with one count of conspiracy and three counts of violating Section 7206(1) for years 1997, 1998, 1999, and 2000. United States v. Luczkow et ux., No. SA-06-CR-517-WRF (filed October 4, 2006). The jury convicted the Luczkows of count four, relating to year 2000, but acquitted them of the remaining counts. At trial, the Luczkows called AAA planner Lentz, who previously testified as a Government witness at the Seattle trial, as a defense witness. The Luczkows did not call an expert witness to testify about the AAA programs. Lentz had not prepared any of the tax returns that formed the basis for the indictment against the Luczkows. Again, this information related to a case outside of this District has been taken in large part from the Government's memorandum. These facts do not appear to be in dispute. Additionally, as they are provided for background information only, the Court does not find them essential to its legal analysis.

he did nothing wrong - specifically, no evidence showing that he knew that the tax returns he prepared for you were false. At the same time, it is their burden to prove the case against you, and thus we can argue that the government did not call him as a witness because he had nothing bad to say about you. If Benoit testified for us, all he could do is reiterate the points I can make without him.

If he testifies and does not appear credible, then a jury might conclude that it was not reasonable for you to rely upon him. And the same is true for Richard Marks. I have spoken to Richard Marks many times and know him to be a difficult, hotheaded, and often unreasonable person. If we called him as a witness and they didn't like him, (which they wouldn't) they would probably hold that against you. We are far better off arguing that Marks et al must have been believable and persuasive because we know that they convinced 2,000+ people to take a risk and part with large sums of money. In all likelihood, his testimony would only muck it up.

Scott.

Petitioner's Ex. # 15.

Throughout the e-mails disclosed by the Defendant on this subject, the passing reference to LaGrand's potential testimony in Defendant's September 20, 2007 email is the only mention of her as a witness. Petitioner's Exs. # 13-17. LaGrand's name only arises again in reference to an individual who testified for her, but who apparently refused to testify on behalf of the Defendant. Petitioner's Exs. # 13 and # 17.

Not only was the trial strategy not to call Kuzel, Redd or LaGrand formulated early, it was adhered to on the eve of trial. On October 1, 2007, eight days prior to trial, all three of the Defendant's counsel signed a trial memorandum that listed the expected defense witnesses. LaGrand's name was not on the list. Docket # 107, Trial Brief of Defendant, p. 4. It also became evident that the trial strategy formulated by Engelhard was being followed as the trial progressed.

Defendant testified at trial on his own behalf. He testified that he was introduced to AAA by a co-worker, Raghavan K. Chari ("Chari"). In joining AAA and participating in the Look Back and Look Forward programs, the Defendant claimed that he relied upon representations by Marks and Benoit that the tax deductions used in those programs were legal. The Defendant also testified that Drummer lent credibility to the AAA tax plans because the Defendant understood Drummer to have been a former IRS revenue agent. Benoit prepared the Defendant's individual and business tax returns for years 1998, 1999, and 2000. In testifying about tax years 1998, 1999, and 2000, the Defendant did not mention LaGrand. Trial Transcript, Vol. III, pp. 85-98, 104, 108-111. The Defendant testified that, after Marks was arrested in February 2001, he continued to use AAA to prepare his tax returns and that LaGrand had assured him that the plans were legal. The Defendant acknowledged that he was not assigned LaGrand as his CPA until after Marks' arrest. Trial Transcript, Vol. III, pp. 115-17; Government Trial Exhibit Nos. 19-22. The Defendant did not testify at trial about any conversations with Kuzel or Redd. Before trial, the Defendant told Attorney Engelhard that he did not have contact with either of these individuals. Engelhard Aff., 8/11/08", ¶ 17, Petitioner's Ex. # 5.

Aside from the Defendant's testimony, Engelhard and Stientjes called Scott Stringer, a CPA, as an expert witness for the defense. Stringer essentially testified that the AAA programs, as designed, were legitimate. In addition, Engelhard and Stientjes called two additional witnesses: Bruce Burner, a former co-worker of the Defendant who also joined AAA; and Carl Charlot, a former associate of Drummer. Trial Transcript, Vol. III, pp. 1-78; Trial transcript, Vol. IV, pp. 19-43; Engelhard Aff., 8/11/08, ¶¶ 20-23, Petitioner's Ex. # 5.

The witnesses actually called at trial support the conclusion that the strategic decisions outlined by Engelhard in his hearing testimony were predetermined and actually followed. In response to a questions regarding his trial strategy, Engelhard indicated as follows:

> I felt and still feel that it was a situation where we had a very strong, good-faith defense. We had very strong witnesses that were tested, previously tested in -- first of all our expert, Scott Stringer, who worked closely with Rob Stientjes, with Bruce Burner, who was a doctor, who was in essentially much the same situation, had worked with -- in the hospital with Dr. Dehlinger, got involved as well and testified for the Government in the first trial as a Government witness, that he believed it in good faith. And then we had this other witness named Carl Charlot who had worked under Roosevelt Drummer and was a very close friend of his and felt that -- explained how very charismatic Roosevelt Drummer was, how believable he was, and that he had even convinced Carl that the program was legal. So I felt that I had, between the expert, the witness who worked with -- and was in basically the same shoes as Dr. Dehlinger, and then Carl Charlot, we had really covered the ground. And that a planner -- calling a planner would be basically covering that same ground, and it would be doing so at a risk of potentially having a witness be found by the jury to be not credible and thus undermining what I felt was a very strong defense.

Evidentiary Hearing Testimony of Scott J. Engelhard, December 19, 2011, Tr. pps 111-112.

Even the testimony of Petitioner at his evidentiary hearing supports the finding that the trial strategy followed by Engelhard was consistently not to call LaGrand or Redd. The following excerpts are from the direct examination of Petitioner by his attorney:

Q:      What were you told -- now we're moving into September/October time of the time of your trial in 2007.

A.      Um-hmm, right.

Q.      What did Mr. Engelhard tell you about Collis Redd?

A.    Mr. Engelhard just felt that he wouldn't be a good witness for me, that I didn't
-- I had limited exposure to him, and he thought other planners would be more
appropriate to use.

. . . .

Q.    You were in the courtroom with him, you were in the hallway with him, you
talked to him afterwards. Is that when you told him you wanted to put Tara
LaGrand on?

A.    During the trial.

Q.    Yes, sir.

A.    I think the last time was in the hotel room right before the trial.

Q.    And what did he say to you?

A.    He said the same thing he had always been saying, that Tara LaGrand is going
to hurt you if she testifies for you, Erik. She's going to hurt you.

Evidentiary Hearing Testimony of Dr. Erik Dehlinger, December 20, 2011, Tr. pps. 335, 347.

Post-Trial correspondence also does not support Petitioner's version of the events at trial.

The following excerpts are from the cross-examination of Petitioner by counsel for the Government.

Q.    In the aftermath of the verdict, there is nothing from you saying if we had
only called LaGrand, Kuzel, or Redd, maybe things would have been
different; isn't that right?

A.    That is true.

Q.    And there was nothing saying you promised that we could have called
LaGrand, or I tried to convince you to call Redd, or if Kuzel had only testified

44

the outcome would have been different. That's not in this e-mail the day of the verdict, is it?

A.     I was pretty lost at that time, Mr. Holliday.

. . . .

Q.     This is in January. This is from you to Scott Engelhard. "Hi again, Scott.  "I don't think you got this part of the e-mail I forwarded to you:" "Rob, Thanks for the update. Have you received anything from the court for this sentencing phase? "The Court guy that I met with told me he had a large stack of individuals ahead of me and likely wouldn't get anything out to any of the attorneys until after the holidays. He said it would be a 30-page document that both defense and prosecution could potentially add and detract from. "Do you have any sense of the timeline once you receive this 30-page document? How much time do you have to review, and then send it back -- and then send back? Is it a back and forth for a couple of times? I would think whatever each side wants to add or detract will have to be reviewed at least once by the other side. How long is this process before it finally goes to the judge? Is Judge Wooten just waiting to set a date after he receives this document? "Erik." So you have a lot of questions in that e-mail, don't you?

A.     Yes.

Q.     But none of the questions are why didn't you call LaGrand, why didn't you call Redd, why didn't you call Kuzel?

A.     At that time we were preparing for sentencing and appeal.

Q.     There is no e-mails that you sent to these guys that have the name Redd or Kuzel in any of them. And yet you say today that was an integral part of your case.

A.     I thought they were very -- they would have been very important witnesses for me.

.....

45

Q.    Well, you say that today. There is no evidence that you ever communicated that to your lawyer in any of the documents that you have attached to your brief in this case.

A.    But the majority of our talk is phone calls and face time.

Q.    Well, there is enough conversation in your e-mails about Benoit and Marks that that was being heavily considered. There is nothing on Kuzel and Redd. Right?

A.    They would have been important witnesses for me.

Q.    Well, you say that today.

A.    Yeah. I said it then, too. I said it in December 2006 when I first met them.

Q.    All we have to do is go on evidence, and there is no evidence of that is what I am telling you.

A.    I am sorry you don't have that type of evidence you need, sir.

Evidentiary Hearing Testimony of Dr. Erik Dehlinger, December 20, 2011, Tr. pps. 369-372.

The trial strategy planned by Engelhard was plotted early and adhered to through trial. Engelhard's advice regarding defense witnesses was justified as outlined and supported by the record. The decision not to call witnesses who would be subject to impeachment for their prior crimes (LaGrand and Kuzel) or for their participation in a criminal organization (Redd) was simply a reasonable strategic decision which the record does not indicate that Dehlinger opposed. In addition, since Redd and Kuzel had no meaningful interaction with the Petitioner, Engelhard's decision to not call them as witnesses was motivated primarily by the rules of evidence, in particular the rule of relevance, rather than any conflict of interest. Fed. R. Evid. 401, 402. Moreover, the

absence of a link to any conflict of interest is evident by Engelhard's consideration of the most logical AAA planner witnesses, namely, Benoit and Marks, the primary individuals upon whom the Petitioner purportedly relied. The Petitioner's e-mails between him and counsel show that Engelhard considered calling Benoit, who prepared the majority of the Petitioner's fraudulent AAA-related returns. As the e-mails show, Engelhard chose not to call Benoit after talking to Benoit and then consulting the Luczkows' attorneys. Again, as noted previously, on September 20, 2007, Engelhard wrote the following message to the Defendant:

> After talking to George Benoit myself and discussing the possibility of calling him as a witness with Rob and with Luzckow's attorneys, I have concluded that we should not call him as a witness. The potential risks outweigh the benefits. At the same time, we will not shy away from talking about Benoit at trial. Since he was never charged with a crime, it appears that the government has concluded that he did nothing wrong–specifically, no evidence showing that he knew the tax returns he prepared for you were false. At the same time, it is their burden to prove the case against you, and thus we can argue that the government did not call him as a witness because he had nothing bad to say about you. If Benoit testified for us, all he could do is reiterate the points I can make without him. If he testifies and does not appear credible, then a jury might conclude that it was not reasonable for you to rely upon him.

> Petitioner's Ex. # 15.

The e-mails further show that Engelhard explained to the Defendant why Marks would not have been a good defense witness:

> And the same is true for Richard Marks. I have spoken to Richard Marks many times and know him to be a difficult, hot-headed and often unreasonable person. If we called him as a witness, and they didn't like him (which they wouldn't) they would probably hold that against you. We are far better off arguing that Marks et al must have been believable and persuasive because we know that they convinced 2000+ people to take a big risk and part with large sums of money. In all likelihood, his testimony would only muck it up.

> Petitioner's Ex. # 15.

The Court is persuaded that Engelhard made tactical decisions about calling LaGrand, Kuzel and Redd, as well other witnesses, as part of an overarching trial strategy, which he thought would be most beneficial to defendant. The record supports the conclusion that Dehlinger and Stientjes acquiesced in this trial strategy. The Court finds that the decision not to call these witness was based on trial strategy alone and not linked to any potential conflict of interest. See generally Stephens v. Branker, 570 F.3d 198 (4th Cir. 2009) (finding that "in these habeas corpus proceedings, [defendant] contends that [his counsel] should have done more, but he fails to demonstrate that the trial decisions made by his counsel were anything other than tactical judgments").

In summary, after careful review and consideration, the Court finds that Petitioner fails to show any link between Engelhard's decision not to call LaGrand, Redd and Kuzel as witnesses and any conflict of interest. The evidence contemporaneous with trial as well as the testimony offered at the hearing before this Court on the habeas petition are consistent with a finding that Engelhard's decision not to call any of these three witnesses was based on trial strategy alone, and not due to any divided loyalties on the part of Engelhard. This strategy is evidenced not only by Engelhard's testimony but also by the testimony of co-counsel Stientjes and Petitioner himself. The trial strategy was adopted at the outset of the case, and was consistently adhered to in the early pretrial stages of the case as well as on the eve of trial and during the trial of the case itself. This strategy applied to the decision not to call Tara LaGrand, who is the primary focus of the Petitioner's claims. Additionally, this strategy was applied evenhandedly to not only these three "planner" witness, but other witnesses which were not called for similar strategic reasons. The Petitioner, according to the record before this Court, acquiesced in the trial strategy regarding who would and would not be

called as witnesses in his case. In conclusion, these decisions were not made based on any conflict in Engelhard's representation, but based on which witnesses gave Petitioner the best opportunity for acquittal. For these reasons, this Court concludes no relief is warranted.

## CONCLUSION

For all of the reasons cited above, Petitioner's motion for relief pursuant to 28 U.S.C. § 2255 is **DENIED** and this Petition is **DISMISSED**, with prejudice.

The Court has reviewed this petition in accordance with Rule 11 of the Rules Governing Section 2255 Proceedings and 28 U.S.C. § 2253. Applying the provisions set forth at 28 U.S.C. § 2253(c), this Court concludes that it is appropriate to issue a certificate of appealability as to all issues raised herein.

**IT IS SO ORDERED.**

_s/ Terry L. Wooten_
**TERRY L. WOOTEN**
**UNITED STATES DISTRICT COURT JUDGE**

May 16, 2012
Florence, South Carolina